UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------X
MUSALLI FACTORY FOR GOLD & JEWELLRY CO.,   :
                                           :
                   Plaintiff,              :
                                           :
                                           :          **COMPLAINT**
              -v-                           :
                                           :          **JURY TRIAL**
                                           :          **DEMANDED**
NEW YORK FINANCIAL LLC and                 :
AMIR F. BOKTOR,                            :
                                           :
Defendants.                                :
-----------------------------------------------------------------------X

Plaintiff, Musalli Factory For Gold & Jewellry Co. ("Musalli"), through its undersigned

counsel, the Lauro Law Firm, for its complaint against defendants New York Financial LLC

("NYF") and Amir Boktor ("Boktor") alleges as follows:

## I.  PRELIMINARY STATEMENT

1.      This action arises from a fraudulent investment scheme carried out by defendants

who engaged in a conspiracy to convert and misappropriate $5 million invested by Musalli.

2.      As co-conspirators, defendants (along with other non-parties) were aware of one

another's actions and intentions in connection with a sophisticated plan to deprive Musalli of its

money and property contrary to law. Defendants also attempted to assert certain sham legal

positions through an attorney as part of an effort to convert these funds and otherwise intimidate

Musalli.

3.      Defendants misrepresented to Musalli that they would invest Musalli's funds by

purchasing securities in a secure investment program with JPMorgan Chase & Co., Inc. (the

"JPMorgan Portfolio Manager Program"), while at all times intending to convert millions of

dollars to their own use. In addition, each defendant breached a fiduciary duty owed to Musalli to safeguard the substantial sums invested as part of the investment program.

4.      The scheme was carried out through the use of the U.S. mails and wires and involved predicate acts in this district as well as outside of the United States. As a result of defendants' unlawful actions, Musalli lost the $5 million it invested with defendants.

## II. PARTIES

5.      Musalli is a corporation organized under the laws of the Kingdom of Saudi Arabia and is engaged in the business of manufacturing gold and jewelry products. Musalli has been in business for over 80 years and has over 700 employees. Its principal place of business is in Jeddah, Saudi Arabia. Abubaker Elnajjar ("Elnajjar") is the chief financial officer for Musalli and resides in Saudi Arabia.

6.      NYF is a Nevada limited liability company with its principal place of business in New York. On its business stationery, NYF identifies a primary office at 369 1st Street, Brooklyn, New York, which upon inspection is actually a residential brownstone. NYF also represents that it has offices at 14 Wall Street, New York, New York.  Although NYF purports to be an investment advisor, it is not properly registered as such with either the U.S. Securities and Exchange Commission or the State of New York. Upon information and belief, NYF is a sham entity used by defendants to carry out their unlawful schemes.

7.      Boktor is a citizen of New York and formed NYF in 2004. Upon information and belief, Boktor uses and has used several aliases to hide his true identity. It is believed that Boktor resides at the Brooklyn address listed as NYF's primary office.

### III.  NON-PARTIES

8.      JPMorgan Chase & Co., Inc. ("JPMorgan") is a full-service global financial firm organized under the laws of Delaware, with its principal place of business in New York, New York.  It also uses the brand names JPMorgan Chase and Chase when marketing to and servicing its clients.

9.      Nicholas Gambella ("Gambella") is a citizen of New York and an account representative with JPMorgan in Brooklyn, New York. Gambella was essential to the scheme because he was able to use his position as an employee of JPMorgan to induce Musalli to invest millions of dollars with defendants. At all times, Gambella acted as an agent of JPMorgan.

### IV. JURISDICTION AND VENUE

10.      This Court has diversity jurisdiction over this action and of the subject matter of the lawsuit pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and the matter in controversy exceeds $75,000 exclusive of interests and costs.

11.      Moreover, this Court also has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this action involves a federal question arising under the federal securities laws, including § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

12.      Personal jurisdiction over defendants is based on Article 3 of New York's CPLR, which provides for jurisdiction over defendants who are New York citizens or who engage in tortious acts in New York. In this case, defendants are citizens of New York and regularly engage in business in this state. Furthermore, as conspirators, defendants acted in concert to commit tortious and fraudulent acts in New York such that exercising personal jurisdiction over them would not offend traditional notions of fair play and substantial justice. Personal

jurisdiction over defendants is also based upon the Securities and Exchange Act of 1934, which subjects defendants to the jurisdiction of this Court.

13.     Venue is proper in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claims occurred in New York County.

## V. ALLEGATIONS COMMON TO ALL CLAIMS

### A.  The Scheme to Steal $5 Million

14.     The essence of the scheme is straight-forward: defendants represented to Musalli that they could invest its funds in the JPMorgan Portfolio Manager Program and obtain double-digit returns, while at the same time arranging for credit facilities with JPMorgan or other financial entities. Under these and other false pretenses, Musalli was induced to forward $5 million to JPMorgan in New York. Thereafter, defendants asserted false and sham legal positions as part of an effort to evade Musalli's inquiries and convert these funds to their own use. Finally, upon information and belief, defendants have absconded with all or substantially all of Musalli's $5 million.

15.     The scheme was carried out by an enterprise consisting of an association-in-fact, which included NYF, Boktor, Gambella, and others.  The enterprise employed Jacques Catafago ("Catafago"), a New York attorney representing NYF and Boktor. Defendants conducted the affairs of the enterprise through a pattern of racketeering acts that included violations of the federal mail and wire fraud statutes. Defendants' unlawful activities affected interstate commerce, and Musalli has been injured by reason of the conduct described in this complaint.

16.     The scheme began in or about February 2004, when Boktor communicated with the chief financial officer of Musalli, Abubaker Elnajjar, in Saudi Arabia and represented, among other things, that NYF would act as an investment advisor and that Musalli funds would be

invested in securities purchased in connection with the JPMorgan Portfolio Manager Program. Boktor falsely stated that the program would generate double-digit returns and that the program was a safe and secure investment opportunity. In addition, Boktor misrepresented that NYF could assist Musalli in obtaining credit facilities at JPMorgan or other financial institutions.

17.     These statements by Boktor were patently and intentionally false and were made in order to induce Musalli to part with millions of dollars. In truth and fact, it was defendants' intention all along to abscond with and convert funds belonging to Musalli.

### B. The Sham Investment Advisor Agreements and Involvement of JPMorgan

18.     In or about June 2004, NYF and Boktor forwarded to Elnajjar an Exclusive Investment/Credit Management Agreement ("the First Agreement"), which was executed by Musalli and returned to NYF. *See* Exhibit 1. The First Agreement identified the bank of record as "JP Morgan Chase Bank, New York" and Nicholas Gambella as the "JP Morgan Chase Investment Contact." In the First Agreement, defendants assured Musalli that they would: (1) act with utmost good faith; (2) monitor, supervise, and direct Musalli's investments according to Musalli's investment objectives; and (3) provide Musalli with a written report of the valuation of its investments. Because the First Agreement was procured by fraud and for other reasons, it is not legally binding upon Musalli.

19.     As described above, from the beginning of the scheme (and to induce Musalli to part with its investment funds) defendants agreed to act as fiduciaries and agents for Musalli and to assume a duty and obligation to perform their duties in good faith and in a manner reasonably to be in Musalli's best interests.

20.     In August 2004, reasonably relying on the representations made by defendants, Musalli transferred $2.05 million to JPMorgan, in New York County, in connection with the

JPMorgan Portfolio Manager Program. Upon information and belief, the funds were placed in a JPMorgan account controlled by Gambella.

21.     On or about September 2, 2004, a JPMorgan Investment Strategy Report was prepared for Musalli. *See* Exhibit 2. In these written promotional materials (which were delivered by express mail to Musalli in Saudi Arabia) defendants represented, among other things, that they had the capability and the present intention to: (1) develop a well-designed asset allocation strategy to ensure a sound investment portfolio; (2) monitor the portfolio in the face of market changes to ensure that Musalli's investment objectives were met; (3) create a portfolio for the investments based on a profile of Musalli's risk tolerance level; (4) engage in extensive market research to achieve the goals of the investment; and (5) invest in securities funds under the control of JPMorgan. All of the above representations were intentionally false because, at the time they were made, defendants intended to convert and misappropriate the funds that Musalli placed in the JPMorgan Portfolio Manager Program.

22.     In September 2004, Boktor advised Elnajjar that NYF would be unable to proceed with arranging credit facilities because of unspecified regulatory problems in the United States.

23.     In October and December 2004, defendants sent Elnajjar a JPMorgan "Statement Overview," indicating that Musalli's "Relationship Manager" was the JPMorgan "Branch Manager" and that Musalli's "Financial Consultant" was "JPMorgan Investment." *See* Exhibit 3. These documents are not genuine JPMorgan account statements and instead are fake statements created by defendants in furtherance of the scheme.

24.     In late December 2004, Gambella, Boktor, and Elnajjar spoke by telephone regarding the JPMorgan Portfolio Manager Program. At the time of the call, Gambella and Boktor were at JPMorgan's office in Brooklyn, New York.  Gambella, among other things,

described in detail the benefits of the program and his role as a securities representative and a vice-president for investments at JPMorgan. This telephone call was intended to further the scheme by lulling Musalli into a false sense of security that its investment funds would be safeguarded by JPMorgan and Gambella.

25.      Thereafter, Boktor told Elnajjar that NYF's regulatory issues had been resolved and that the investment program and credit facility could proceed through JPMorgan.

26.      On or about March 14, 2005, Musalli and NYF sought to enter into an Exclusive Investment Management & Representation Agreement ("the Second Agreement") again confirming that defendants and JPMorgan would act as fiduciaries with respect to the investment funds held by JPMorgan. *See* Exhibit 4. Defendants and JPMorgan further confirmed that they were Musalli's agents and "attorneys-in-fact," and thus assured Musalli that they would act with utmost good faith. This document, which was sent by telecopy from Catafago's law office in New York County to Musalli in Saudi Arabia, was also adopted by Gambella and JPMorgan.  At or about this time, defendants also sent Musalli another sham account statement confirming that Musalli investment funds were being held by JPMorgan.

27.      The Second Agreement referenced and incorporated the JPMorgan Portfolio Manager Program and represented that defendants would invest the funds with JPMorgan using a "proprietary technical model" and a "well-designed asset allocation strategy [as] the foundation of a sound investment portfolio." Defendants also reasserted their prior misrepresentations regarding the JPMorgan Portfolio Manager Program as described in paragraph 21, above. These statements were patently and intentionally false, since at all times, defendants did not intend to invest Musalli's funds but instead intended to convert and misappropriate the funds.  Because the

Second Agreement was procured by fraud and for other reasons, it is not legally binding upon Musalli.

28.    Upon information and belief, Gambella participated with defendants in arranging for the JPMorgan promotional materials and other information regarding the JPMorgan Portfolio Manager Program to be sent to Musalli as part of the scheme to convert and misappropriate Musalli's investment funds.

**C. The False Promises to Obtain a Credit Facility for Musalli**

29.    Thereafter, defendants purportedly embarked upon an effort to obtain credit facilities for Musalli through JPMorgan or other financial institutions. NYF and Boktor suggested that the funds in the JPMorgan Portfolio Manager Program could be used to secure a credit facility in favor of Musalli.

30.    In fact, in early 2005, Boktor contacted two JPMorgan bankers in London - Martin Stokes and Kamir Tannir - regarding the investment program and Musalli's need for credit facilities. Later in March 2005, Stokes and Tannir visited Musalli in Jeddah, Saudi Arabia to assess Musalli's creditworthiness in connection with a possible credit facility to be advanced by JPMorgan. During the visit, Stokes and Tannir confirmed to Elnajjar that Musalli's investment funds were in the custody and control of JPMorgan, and that they intended to take steps to arrange for a credit facility in favor of Musalli.

31.    Upon information and belief, Stokes and Tannir communicated regularly with Boktor and Gambella regarding Musalli's participation in the JPMorgan Portfolio Manager Program and Musalli's desire for a credit facility. Indeed, at one point the JPMorgan bankers in London were interested in running the investment program for Musalli.

32.     However, rather than make bona fide efforts to arrange for a line of credit, defendants in fact intended to convert Musalli's investment funds to their own use.

33.     In or about May 2005, Boktor also stated to Elnajjar that in order to obtain a line of credit, Musalli would need to increase its investment in the JPMorgan Portfolio Manager Program to at least $5 million. This was a false statement, since defendants never intended to arrange a credit facility for Musalli or operate a bona fide investment program. Instead, they made false representations regarding the availability of a credit facility in order to induce Musalli to send additional funds to JPMorgan.  Thereafter, in 2005, in reasonable reliance upon the misrepresentations described herein and others, Musalli sent additional funds amounting to $2.95 million to JPMorgan in New York County. Upon information and belief, the funds were placed in a JPMorgan account controlled by Gambella.

**D.  The Sham Legal and Business Documents Used By Defendants**

34.     Defendants also used false legal and business documents in connection with the fraudulent scheme. As described above, defendants used fake JPMorgan account statements to convince Musalli that its funds were safe and secure. In addition, Boktor falsely stated to Elnajjar that in order to pursue a credit facility, Musalli would have to issue promissory notes to NYF, even though there was no consideration given for the notes. Upon information and belief, the promissory notes were drafted by Catafago and were used as part of the scheme to defraud Musalli.  *See* Exhibit 5.  Because no funds were ever loaned by NYF to Musalli and the notes were procured by fraud, they are of no force or effect. However, NYF and Boktor have repeatedly asserted to Musalli that the notes are enforceable instruments, even though they are merely props in the fraudulent scheme.

35.     Furthermore, on September 9, 2005, Boktor mailed Musalli a document purportedly showing that Musalli had credit facilities with JPMorgan and further asserted that Musalli had some how breached the Second Agreement. *See* Exhibit 6. As defendants were well aware, however, Musalli had no such existing lines of credit with JPMorgan. Upon information and belief, this document was generated by or with the assistance of Gambella and was purported to be a genuine JPMorgan document. However, defendants intended to use the document to create the false impression that Musalli was in breach of a legal obligation and could therefore be liable to NYF.

36.     Boktor also mailed a letter to Musalli asserting that Musalli owed NYF millions of dollars for "breaching" the Second Agreement. *See* Exhibit 7. This document was used as part of the scheme to defraud, and indeed Catafago has asserted the incredible legal position that there is an "account stated" between NYF and Musalli such that Musalli is liable to NYF for over $4.5 million.

37.     On September 13, 2005, Gambella again spoke by telephone with Elnajjar and made continued assurances that the JPMorgan Portfolio Management Program was specifically tailored to meet Musalli's investment needs. Gambella made these statements and others to continue to lull Musalli into believing that JPMorgan was acting in Musalli's best interests, when in truth and fact, defendants were converting and misappropriating Musalli's investment funds. Gambella also stated that Musalli had an ongoing relationship with JPMorgan bankers in London, which Gambella knew to be untrue. Gambella made that statement and others as part of defendants' efforts to intimidate Musalli and to falsely suggest that Musalli may have breached a legal obligation to NYF.

38.     In October 2005, Catafago met with Musalli representatives in London to discuss the status of the JPMorgan Portfolio Manager Program and the efforts to obtain a credit facility. Following the meeting, Catafago sent an e-mail to Elnajjar suggesting that Musalli could owe NYF $100 million. *See* Exhibit 8. This e-mail was also used as part of the scheme to defraud.

39.     Thereafter, Musalli retained counsel and demanded that NYF provide an accounting for all of the funds held by defendants. Musalli also requested that JPMorgan provide information regarding the funds it was holding on behalf of Musalli. Defendants have refused to furnish any information regarding the location of Musalli's funds and have not returned the funds. This effort to stonewall Musalli is further evidence of the ongoing nature of the scheme.

40.     As a result of the acts, omissions, and intentional misrepresentations of defendants, they are individually and collectively liable to Musalli for the loss of its investment.

**E.  The Stolen Funds**

41.     Musalli arranged the following wire transfers of funds from outside of the United States to a JPMorgan Chase bank account (routing number 021000021/swift code CHASUS33) located New York, New York.  Each wire specified that the funds were being transferred in connection with Musalli's investment program with JPMorgan in New York.  These wire transfers form predicate acts of the ongoing scheme:

| Date of Wire Transfer | Amount of Wire Transfer (US $) | Wired From Bank | Wired From Account Number | Wired to JPMorgan Account Number |
|---|---|---|---|---|
| 8/11/04 | 500,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |
| 8/17/04 | 500,000.00 | Saudi British Bank | 001256619001 | 101083017765 |
| 8/18/04 | 200,000.00 | National Commercial Bank | 1014271400201 | 101083017765 |
| 8/18/04 | 200,000.00 | Samba Financial Group | 4251539 | 101083017765 |
| 8/18/04 | 150,000.00 | Saudi British Bank | 001256619001 | 101083017765 |
| 8/23/04 | 300,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |
| 8/24/04 | 200,000.00 | Banque De 'Industrie Et Du Travail SAL | 13286008USD4491 | 101083017765 |
| 5/29/05 | 250,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |
| 5/31/05 | 1,050,000.00 | Saudi British Bank | 001256619001 | 101083017765 |
| 7/20/05 | 100,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |
| 7/21/05 | 150,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |
| 7/24/05 | 150,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |
| 7/25/05 | 100,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |
| 7/26/05 | 100,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |
| 8/20/05 | 150,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |
| 8/20/05 | 400,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |
| 8/21/05 | 200,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |
| 8/22/05 | 100,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |
| 8/23/05 | 200,000.00 | National Commercial Bank | 10142714000201 | 101083017765 |

## VI. CAUSES OF ACTION

### COUNT 1

### SECURITIES FRAUD
### AGAINST ALL DEFENDANTS

42.     Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 41 as if fully set forth herein.

43.     Defendants, singularly and in concert, engaged in a plan, scheme, artifice, and unlawful conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud upon Musalli. Defendants made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements not misleading to Musalli.  The purposes and effects of defendants' schemes were to create the illusion of an investment vehicle operated by defendants so that defendants could induce Musalli to invest money and then convert Musalli's assets.

44.     Defendants, pursuant to the plan, scheme, artifice, and unlawful conspiracy and course of conduct, knowingly and recklessly issued, caused to be issued, and participated in the issuance of false and misleading statements to the investing public, including Musalli, which were contained in various documents specified herein, and failed to disclose material facts to the investing public, including Musalli.

45.     Defendants are liable as direct participants in the wrongs alleged herein. Defendants, because of their position of control and authority, were able to and did, directly or indirectly, control the content of various communications and Musalli's assets.

46.     Defendants had a duty to promptly disseminate accurate and truthful information with respect to Musalli's investments.  Defendants participated in the wrongdoing complained of

in order to induce Musalli's investment in the JPMorgan Portfolio Manager Program, to continue the illusion of prospects for growth and increased profitability, and to conceal facts and prospects.

47.      Defendants omitted to state material facts that were necessary in order to make the statements not misleading when they materially misrepresented that they had the present intention to: (1) develop a well-designed asset allocation strategy to ensure a sound investment portfolio; (2) monitor the portfolio in the face of market changes to ensure that Musalli's investment objectives were met; (3) create a portfolio for the investments based on a profile of Musalli's risk tolerance level; (4) engage in extensive market research to achieve the goals of the investment; and (5) invest in securities funds under the control of JPMorgan. Defendants made such misrepresentations on one or more occasions by the use of the mails, telephone lines, or by use of instrumentalities of interstate commerce.

48.      The misrepresentations and omissions by defendants were material in each instance with respect to each of the transactions to which they pertained.  Musalli did not know of the falsity of the statements or of the omissions at the time it placed funds with JPMorgan or for a significant period of time after placing the funds with JPMorgan.

49.      Defendants knew at the time they made the representations concerning the investments that such representations were false and misleading.

50.      Defendants made each of the misrepresentations and omissions in connection with the purchase or sale of securities.

51.      By reason of the forgoing, in each instance, defendants violated § 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 promulgated thereunder.

52.     Defendants are liable to Musalli for the full amount of all damages as shall be proved at trial, which include those sustained as the result of their respective acts of securities fraud, in violation of § 12(a)(2) of the Securities Act of 1933, § 10(b) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder.  Musalli believes the aggregate amount of such damages to exceed $5 million plus interest, costs, and reasonable attorney's fees.

## COUNT 2

## BREACH OF FIDUCIARY DUTY
## AGAINST ALL DEFENDANTS

53.     Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 52 as if fully set forth herein.

54.     At all times relevant hereto, defendants had complete control over Musalli's assets, which had been provided to them for the purpose of investing in the JPMorgan Portfolio Manager Program.

55.     Defendants owed Musalli a fiduciary duty to act in Musalli's best interest with respect to his investments and were bound to exercise the utmost good faith and reasonable care in the performance of the duties owed to Musalli.

56.     Musalli trusted and relied upon defendants to provide it with financial and investment advice with reasonable skill, care, and diligence and to act in Musalli's best interest.

57.     In breach of those fiduciary duties, defendants, as described herein, among other things, (1) failed to develop a well-designed asset allocation strategy to ensure a sound investment portfolio; (2) failed to monitor the portfolio in the face of market changes to ensure that Musalli's investment objectives were met; (3) failed to create a portfolio for the investments based on a profile of Musalli's risk tolerance level; (4) failed to engage in extensive market research to achieve the goals of the investment; (5) failed to maintain the investment under the

provisions of the JPMorgan Portfolio Manager Program; (6) provided Musalli with false and misleading documents; (7) converted Musalli's funds; (8) placed their own interests ahead of Musalli's; and (9) failed to safeguard Musalli's assets.

58.     By reason of the defendant's failure to serve Musalli in a proper, skillful, prudent, and diligent manner as alleged herein and because defendants directly breached their fiduciary duty, Musalli has been damaged in an amount not yet fully ascertained, but believed to be at least $5 million plus interest, costs, reasonable attorney's fees, and punitive damages.

## COUNT 3

### CONVERSION
### AGAINST ALL DEFENDANTS

59.     Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 58 as if fully set forth herein.

60.     Musalli entrusted defendants with funds that were to be invested on behalf of Musalli in accordance with defendants' representations.

61.     However, defendants did not actually invest Musalli's money in an appropriate manner and converted all or part of Musalli's investment funds.

62.     Defendants have each acted wantonly and in total violation of Musalli's rights.

63.     As a result of defendants' wrongful and intentional conversion of Musalli's investment funds, Musalli has been damaged in an amount believed to be at least $5 million plus interest, costs, reasonable attorney's fees, and punitive damages.

## COUNT 4

### UNJUST ENRICHMENT
### AGAINST ALL DEFENDANTS

64.     Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 63 as if fully set forth herein.

65.     Defendants received and used Musalli's investment assets for their personal benefit.

66.     The defendants fraudulently obtained investor proceeds from Musalli.

67.     Because defendants fraudulently obtained Musalli's assets, it is not just, fair, equitable, or conscionable for defendants to benefit from their ill-gotten gains.

68.     As a consequence of the forgoing, defendants have been unjustly enriched, in an amount to be determined, but estimated to be at least $5 million plus interest, costs, reasonable attorney's fees, and punitive damages.

## COUNT 5

### NEGLIGENCE
### AGAINST ALL DEFENDANTS

69.     Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 68 as if fully set forth herein.

70.     Defendants owed Musalli, at a minimum, a duty of reasonable and ordinary care in their dealings with Musalli, including the care and competence of a reasonable investment advisor.

71.     Defendants have failed to perform the duties of care imposed upon them when they were entrusted with Musalli's funds, thereby resulting in damages to Musalli.

72.     Musalli's account was handled in a negligent manner incompatible with its stated investment objectives, the purported professional skill and ability of defendants, and their purported professional competence.

73.     As a proximate result of defendants' negligence, Musalli has been damaged.

74.     By reason hereof, Musalli has been damaged in an amount believed to be at least $5 million plus interest, costs, reasonable attorney's fees, and punitive damages.

## COUNT 6

### NEGLIGENT MISREPRESENTATION
### AGAINST ALL DEFENDANTS

75.     Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 74 as if fully set forth herein.

76.     Defendants were, at a minimum, careless in imparting words upon which Musalli and others were expected to rely.

77.     Musalli, unaware of the misstatements made by defendants, reasonably relied on the misstatements and misrepresentations of defendants. Defendants were aware of Musalli's reliance, and Musalli's reliance caused him to act or fail to act.

78.     Defendants induced Musalli to invest his funds on the basis of false information that defendants supplied to Musalli.

79.     Defendants, individually, and as agents of JPMorgan, were the authors of words expressed directly to Musalli, which was owed a duty of care by defendants, with knowledge that the words would induce reliance or be acted upon by Musalli.

80.     As a result of defendants' misrepresentations and omissions, Musalli has suffered economic harm.

81.     By reason hereof, Musalli has been damaged in an amount believed to be at least $5 million plus interest, costs, reasonable attorney's fees, and punitive damages.

## COUNT 7

### COMMON LAW FRAUD IN THE INDUCEMENT AND DECEIT AGAINST ALL DEFENDANTS

82.     Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 81 as if fully set forth herein.

83.     Defendants intentionally made various material misrepresentations to Musalli concerning the JPMorgan Portfolio Manager Program and Musalli's investments therein.

84.     Defendants knew of the falsity of their misrepresentations when made, and at the time of making the misrepresentations, made them with the intent of deceiving and defrauding Musalli and of inducing Musalli to transfer monies to defendants.

85.     Defendants knew that their omissions to state material facts necessary in order to make statements concerning the JPMorgan Portfolio Manager Program and Musalli's investment not misleading, in light of the circumstances in which they were made, contributed to the deception.

86.     Musalli was unaware of the falsity of the representations, believed them to be true, and relied upon them.

87.     Defendants, without Musalli's informed consent, wrongfully, intentionally, fraudulently, maliciously, and deceptively manipulated, converted, and stole Musalli's assets.

88.     Defendants further executed such transactions for the purpose of enriching themselves, and such conduct was in complete and total disregard for Musalli's interests.

89.     As a result of Musalli's misrepresentations and omissions, Musalli has suffered economic harm.

90.     In view of the flagrant, wanton, and intentionally fraudulent conduct on the part of the defendants, Musalli is entitled to punitive damages in an amount to be determined at trial.

91.     By reason hereof, Musalli has been damaged in an amount believed to be at least $5 million plus interest, costs, reasonable attorney's fees, and punitive damages.

### COUNT 8

**ACCOUNTING**
**AGAINST ALL DEFENDANTS**

92.     Musalli repeats and realleges each and every allegation contained and set forth in paragraphs 1 through 91 as if fully set forth herein.

93.     As persons entrusted with Musalli's assets, defendants owed fiduciary duties to Musalli.  These duties required defendants at all times to act on behalf of Musalli in good faith, to exercise the care that an ordinary prudent person in a like position would exercise under similar circumstances, and to conduct themselves in a manner they reasonably believed to be in Musalli's best interest. As part of their fiduciary duties, defendants at all times were required to be honest and candid and to make complete disclosure in their dealings with Musalli.  Moreover, in their communications with Musalli, defendants were obligated to do so honestly, candidly and completely in all material respects.

94.     Defendants breached their fiduciary and other duties to Musalli, failed to faithfully execute service in various ways as described in the complaint, and profited from their breaches of duty through receipt of unauthorized and undisclosed amounts of money.

95.     As fiduciaries, defendants must account to their principal, Musalli, for the funds that they received during the course of their fiduciary relationship with Musalli.

96.     Defendants must therefore render an account to Musalli for the funds the defendants received from Musalli, including an accounting for the interest on the funds they obtained as a result of their wrongful use of Musalli's funds.

## VII. DEMAND FOR RELIEF

By reason of the forgoing, Musalli prays for relief as follows:

(A)     Rescinding Musalli's purchases and investments and requiring defendants to make restitution and repay Musalli the consideration paid by Musalli in connection therewith, plus interest;

(B)     Alternatively, awarding Musalli damages in the amount of its investment, with interest;

(C)     Awarding Musalli pre-judgment and post-judgment interest as a result of the wrongs complained of herein;

(D)     Awarding Musalli his costs, disbursements and expenses of this action, including reasonable attorney's fees, expert's fees, and other costs and disbursements;

(E)     Awarding Musalli punitive damages in the amount of compensatory damages trebled in view of the flagrant, wanton, and intentional fraudulent conduct described in this complaint; and

(F)     Awarding Musalli such other relief as the Court shall deem proper and just.

## VIII. DEMAND FOR JURY TRIAL

Musalli hereby demands a jury trial in this action.

Dated: January 4, 2006
        New York, New York

Respectfully Submitted,

**LAURO LAW FIRM**

By: _____s/_____
JOHN F. LAURO, ESQ. (NY Bar JFL-2635)
KARENA L. NASHBAR, ESQ. (Fla. Bar 697982)
(Not Admitted in New York)
101 E. Kennedy Blvd., Suite 2180
Tampa, Florida 33602
P: 813 222 8990
F: 813 222 8991

*In New York, Reply To:*
300 Park Avenue, Suite 1700
New York, NY 10022
E-mail: jlauro@laurolawfirm.com
*Attorneys for Plaintiff*